UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA HOWARD,

     Plaintiff,

 v.           Case No. 20-cv-1768-pp

CARLA CLOVER,

     Defendant.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE EXCESS PAGES (DKT. NO. 94), GRANTING DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT (DKT. NO. 76) AND DISMISSING CASE**

   Plaintiff Joshua Howard, who is incarcerated at Fox Lake Correctional Institution and is representing himself, filed this case alleging that defendant Carla Clover and three former defendants retaliated against him for filing Case No. 15-cv-557 (E.D. Wis.). Dkt. No. 1. On September 15, 2023, the defendant filed an amended motion for summary judgment. Dkt. No. 76. This decision grants the defendant's motion and dismisses the case.

**I. Procedural Background**

   The court screened the complaint and allowed the plaintiff to proceed on claims that defendant Carla Clover (formerly known as Carla Hartman) and the former defendants retaliated against him for filing Case No. 15-cv-557 (the 2015 case). Dkt. No. 13 at 7. The complaint alleged that defendant Clover and former defendant Kamphuis retaliated against the plaintiff for filing the 2015 case by improperly denying his legal loan requests for the case, threatening to suspend his legal loans, ordering his cell to be searched three times and having

1

his legal paperwork seized. Dkt. No. 1 at ¶19. The plaintiff also alleged that former defendants Bode and John Doe #1 (identified on May 20, 2022 as Paul Wiersma) and John Doe #2 retaliated against him for filing the 2015 case by searching his cell and leaving it in disarray, and by seizing his legal paperwork. Id. at ¶20.

The court previously granted the defendants' motion for partial summary judgment on exhaustion grounds and dismissed the plaintiff's claim that defendants Clover and Kamphuis had retaliated against him for filing the 2015 case by denying his legal loan and disbursement requests for that case. Dkt. No. 54 at 1-2. The defendants did not seek dismissal of the plaintiff's other retaliation claims against Clover and Kamphuis. The court subsequently denied the defendants' motion for reconsideration of the court's order granting the plaintiff's motion to identify a Doe defendant (Wiersma) and denied the plaintiff's motion to strike defendant Wiersma's answer and amended answer. Dkt. No. 55. The court also dismissed defendant John Doe #2 and set a deadline for the parties to file summary judgment motions on the merits. Id. at 9.

On May 19, 2023, defendant Clover and former defendants Bade, Kamphuis and Wiersma filed a motion for summary judgment on the merits. Dkt. No. 60. They sought judgment only on behalf of former defendants Bade and Wiersma, however, and they incorrectly stated that Clover and Kamphuis had been dismissed in the court's order granting the defendants' motion for partial summary judgment on exhaustion grounds. Dkt. No. 61 at 1, 1 n.1. In

2

response to the defendants' motion for summary judgment on the merits, the plaintiff pointed out the defendants' error, stated that he wanted to proceed only against Clover and argued that the defendants' failure to include Clover in their summary judgment motion meant that they conceded that there was sufficient evidence to warrant a trial as to his claims against her. Dkt. No. 74 at 1-2.

The defendants filed a motion for leave to file an amended motion for summary judgment regarding the plaintiff's retaliation claims against Clover, explaining that they inadvertently failed to include the plaintiff's remaining claims against Clover and Kamphuis in their first motion for summary judgment on the merits. Dkt. No. 75 at 2-3. The defendants also filed an amended motion for summary judgment, a brief, proposed findings of facts and the declaration of defendant Clover. Dkt. Nos. 76-79. The court granted the defendants' request for leave to file the amended motion, dismissed defendants Kamphuis, Bade and Wiersma based on the plaintiff's statement that he wanted to proceed only against Clover and denied as moot the defendants' first motion for summary judgment on the merits. Dkt. No. 85 at 7-9. The defendant's amended motion for summary judgment is fully briefed.[1]

_____

[1] The plaintiff's brief in opposition to the defendant's motion for summary judgment exceeds the thirty-page limit by four pages. Dkt. No. 88. In her summary judgment reply brief, the defendant contends that the court should stop reading at page thirty because the plaintiff did not seek leave to exceed the thirty-page limit set in Civil Local Rule 56(b)(8)(A) (E.D. Wis.). Dkt. No. 92 at 6. The plaintiff filed a letter asking the court to allow the oversized brief or, in the alternative, to allow him to refile the brief. Dkt. No. 94 at 1. In the interest of efficiency, the court will allow the oversized brief. See Fed. R. Civ. P, 1; see also

3

**II. Defendant's Amended Motion for Summary Judgment**

    A.   <u>Facts</u>

The plaintiff was incarcerated at Waupun Correctional Institution when the events described in the complaint took place. Dkt. No. 78 at ¶1. The defendant was employed by the Wisconsin Department of Corrections (DOC) as "secretary-confidential" at Waupun during that time. <u>Id.</u> at ¶2.

    1.   *Policy Regarding Legal Loans*

Under DAI (Division of Adult Institutions) Policy 309.51.01, "Legal Loans," the Department of Corrections offers legal loan assistance to indigent incarcerated individuals who are representing themselves in civil or criminal cases. Dkt. No. 90 at ¶1. The policy is divided into seven sections. <u>Id.</u> Section I discusses the general purpose of the loan and requires that an incarcerated person apply for a loan, sign a DOC-1290 form for each case and renew each loan every calendar year and upon transfer to a different facility. <u>Id.</u> at ¶2. Section II discusses legal loan eligibility criteria and lists criteria used by facility staff to determine eligibility or ineligibility for a legal loan. <u>Id.</u> at ¶3. Section III discusses the loan approval and denial practice and restates the requirement that an incarcerated individual fully complete, sign and submit a DOC-1290 before the application will be processed. <u>Id.</u> at ¶4. Section IV discusses legal loan limits. <u>Id.</u> at ¶5. Section V discusses the use of the loan for supplies, postage, printouts and photocopies and states that any supplies

---

General L.R. 1 (compliance with Local Rules is expected, but the rules are intended to be enforced primarily upon the court's own initiative).

provided to an incarcerated individual may not be used to do other incarcerated individuals' legal work. Id. at ¶6. Section VI discusses the responsibilities of the facilities and does not impose any individual requirements on incarcerated persons. Id. at ¶7. Section VII discusses the responsibilities of the applying individual and states that he shall 1) complete and submit a DOC-1290 for each loan, 2) provide any additional requested documentation, 3) use the supplies, photocopies and postage to do his own legal work, and 4) keep track of whether, and inform any applicable parties if, he anticipates reaching the $100 cap of the loan. Id. at ¶8.

Waupun's Facility Procedure Implementation attached to DAI Policy 309.51.01 contains five sections. Dkt. No. 90 at ¶10. Section I discusses the approval and denial procedure and requires only that the individual send a signed form DOC-1290 for each case to the business office. Id. Section II discusses the procedure of obtaining supplies, photocopies and postage if the loan is approved. Id. at ¶11. As for the supplies, it states that each page of paper and envelope will be stamped with the individual's DOC number and will be stamped "Legal." Id. Section III discusses the denial of a legal loan. Id. at ¶12. Section IV discusses the extension of a legal loan beyond the annual $100 cap. Id. at ¶13. Section V warns the incarcerated individual that if he uses the supplies for purposes other than legal activities or gives supplies to another incarcerated person, he may receive a conduct report. Id. at ¶14.

Under the DAI Legal Loan policy, incarcerated individuals may use legal loan money only for their approved cases and may be suspended from

5

obtaining a legal loan based on misuse or if they develop the financial means to cover it themselves. Dkt. No. 78 at ¶19. Incarcerated persons may not provide loaned supplies to another incarcerated person or use them for another person's legal work. Id. When an incarcerated individual requests a legal loan, he must specify the case the loan will be used for. Id. at ¶20. When the defendant was responsible for reviewing a request, she always would do some research before making a decision to approve or deny a loan. Id. For instance, she would look up the case online to make sure it was a current, open case. Id.

Incarcerated individuals may use approved legal loan funds only for their own cases, and may not provide loans supplies to another individual or use them for another individual's legal work. Id. at ¶21. DAI Policy 309.51.01 (eff. January 1, 2013) states, "The supplies provided to an inmate pursuant to a legal loan may not be used by the inmate to do other inmates' legal work. Any such use constitutes a disciplinary offense." Id. The defendant was trained that this meant an incarcerated individual could not use legal loans to work on class action lawsuits, because if there were multiple plaintiffs in a case, that would mean the incarcerated person was effectively using his own legal loans to do other persons' legal work. Id. at ¶22.

When an incarcerated individual requests a disbursement from his legal loan money, he must specify for which case the disbursement will be used. Dkt. No. 78 at ¶23. Although there is no specific amount of money set aside per each case approved for a legal loan, the disbursement will be allowed only if the case for which the disbursement is requested has been approved for a legal

loan. Id. If a request is made for a case for which a legal loan has not been approved, the requested disbursement will be denied. Id. Incarcerated individuals may be suspended from obtaining a legal loan based on misuse or if they develop the financial means to cover it themselves. Id. at ¶24. Requesting disbursement of legal loan money for a case that has not been approved for a legal loan is considered misuse of legal loan money. Id.

To apply for a legal loan, an incarcerated individual must fill out a DOC-1290 "Loan Application & Repayment Agreement" form. Dkt. No. 90 at ¶20. The form asks whether the loan is related to the Inmate Complaint Review System, whether the case has been filed and has a case number, the venue, the parties involved, the type of case, the current deadline and dollar amount of the request and whether the case alleges imminent danger or serious bodily injury. Id. Every time the plaintiff submitted a DOC-1290 to obtain an annual legal loan for a specific case at Waupun, he always included his initial legal loan request. Id. at ¶21. If the legal loan application is approved, the incarcerated individual will receive a memo from the business office informing him that he is able to order the following supplies through his legal loan: white lined paper, typing paper, carbon paper, pen, white envelopes and manila envelopes. Id. at ¶23.

Under DAI 309.51.01, part of the criteria used by business office staff to determine eligibility for a legal loan is the amount of "legal supplies currently in the inmate's possession." Dkt. No. 90 at ¶24. When ordering legal loan supplies, the procedure at Waupun required that upon receipt of the supplies

7

the officer would have the incarcerated individual sign the receipt which was then forwarded to the business office. Id. at ¶25. The supplies are assigned to the approved individual and stamped with his inmate number; when first received by the individual, the supplies do not contain any identifier to any particular case. Id. at ¶26. The incarcerated individual's account is charged upon receipt of the legal loan supplies which have been stamped with his inmate number. Id. at ¶27. If the individual does not use all the paper or envelopes for the particular case they were ordered under, there is no procedure or process for him to turn in excess supplies and obtain a partial refund. Id.

When an incarcerated individual receives a pad of typing or lined paper under a legal loan, the bottom corner of each page is stamped in red ink signifying that it was obtained via legal loan and identifying the person who ordered it. Dkt. No. 90 at ¶28. The same stamp is used on the back of the #10 and manila envelopes. Id.

### 2. Legal Loan and Disbursement Denials

In the first week of May 2015, the plaintiff submitted a proposed class action complaint naming himself and nine other Waupun incarcerated individuals as plaintiffs, a motion for class certification, a brief in support of class certification, a motion for preliminary injunction and his declaration to the librarian for e-filing to the district court for the Eastern District of Wisconsin; the case was docketed as Case Number 15-cv-557. Dkt. No. 90 at

8

¶29. One of defendants named in the 2015 case was former defendant Nikki Kamphuis, who was the defendant's direct supervisor. Id. at ¶30.

In the six months prior to requesting a legal loan for the 2015 case, the plaintiff had submitted legal loan requests for at least nine other cases, but the only legal loan supplies that the plaintiff ordered in 2015 were fifteen envelopes on January 16, 2015, and it had been years since he had ordered paper under a legal loan. Dkt. No. 90 at ¶32.

On June 18, 2015, the plaintiff submitted a legal loan application (DOC-1290) for the 2015 case. Dkt. No. 78 at ¶16; Dkt. No. 83-1 at 22 (Exh. 2003-1)[2]. The application submitted by the plaintiff did not include any information about the case being a proposed class action and in the section for listing the parties, he listed himself as the plaintiff and "Scott Walker" as the defendant. Dkt. No. 90 at ¶35. The same day the plaintiff submitted the legal loan application for the 2015 case, he requested legal loan disbursements for the case; he submitted three requests for postage to send mail to attorneys for the case and he submitted a request for a pen and envelopes. Dkt. No. 83-1 at 23-25, 27 (Exh. 2003-02, 2003-03, 2003-04, 2003-06).

On June 22, 2015, the defendant denied the plaintiff's legal loan application for the 2015 case; the reason was written on the form as, "multiple inmate plaintiffs, does not qualify." Dkt. No. 78 at ¶17; Dkt. No. 83-1 at 22

---

[2] Dkt. No. 83-1 was previously docketed at Dkt. No. 74-2. Due to scanning technical difficulties, certain documents originally docketed at Dkt. No. 74-2 were re-scanned and entered at Dkt. No. 83-1 on November 30, 2023.

(Exh. 2003-01). Also on June 22, 2015, the defendant denied the plaintiff's legal loan disbursement requests with the reason, "Loan denied." Dkt. No. 83-1 at 23-25, 27 (Exh. 2003-02, 2003-03, 2003-04, 2003-06). The defendant wrote on one of the denials, "Further use of legal supplies for cases not approved will result in suspension of all loans." Dkt. No. 83-1 at 26 (Exh. 2003-05). Though the defendant denied the disbursement requests on June 22, 2015, she did not place them in the intra-institution mail to be returned to the plaintiff. Dkt. No. 90 at ¶38.

According to the defendant, she denied the plaintiff's legal loan request because there were multiple plaintiffs in the case and under DAI Policy 309.51.01, legal loan supplies can be used only for the person who requested the loan and for which it was approved. Dkt. No. 78 at ¶17. According to the plaintiff, this was not a legitimate basis for the defendant to deny his legal loan. Dkt. No. 89 at ¶17.[3] The plaintiff states that there is nothing in DAI Policy 309.51.01 or Waupun's implementation or rules which states that legal loans cannot be obtained for civil actions involving more than one plaintiff. Dkt. No. 90 at ¶37.

3. *June 22, 2015 Cell Search*

It is within correctional officers' regular duties in the South Cell Hall to search incarcerated individuals' living quarters and other areas of the cell hall to ensure safety and security and to remove any contraband. Dkt. No. 78 at ¶3.

---

[3] As stated above, the plaintiff's claim that the defendant had a retaliatory motive in denying his legal loan application was dismissed on exhaustion grounds. Dkt. No. 54.

Officer Bade does not recall if he searched the plaintiff's cell on June 22, 2015. Id. at ¶4. If he did, it was either a random search or he was directed by a supervisor to do so. Id. During Bade's shift on June 22, 2015 (second shift), records show twenty-nine individuals were personally searched and two cells were searched in the South Cell Hall. Id. at ¶5. During first shift earlier that day, ten individuals and ten cells were searched in the South Cell Hall. Id.

DOC 306.16 applies to the search of incarcerated individuals' living quarters and requires that staff maintain a written record of the search detailing the identity of the parties, the reason for the search and whether any property was seized. Dkt. No. 90 at ¶39. It also instructs staff to disturb the personal effects of the individual as little as possible and to "only read that part of the inmate's legal materials as necessary to determine that the item is legal material and does not contain contraband." Id. In June 2015, the plaintiff was housed in a double cell that was filled with thousands of pages of paperwork related to his legal work. Id. at ¶¶40-41.

On June 22, 2015, the plaintiff and his cellmate were asked to exit their cell so that it could be searched. Dkt. No. 90 at ¶42. A typical random search would usually last five to fifteen minutes, however this search lasted between ninety to 120 minutes. Id.

At his deposition, the plaintiff described the June 22, 2015 search of his cell, "It appeared to me that – I had several files, folder files full of paperwork and it appeared that they went through each one and when they were done, just kind of flung it on the floor, so transcripts, case log, notes just – in no

11

rhyme or reason to it, just strewn about the floor." Dkt. No. 78 at ¶6. In addition, "Cups and the stuff that was on the bathroom shelf were – they were not where they were left." Id. The plaintiff testified that when Bade came out of searching his cell on June 22, 2015, the plaintiff "looked in the cell and kind of looked at [Bade] and said, 'Come on, I mean this was – really?'" Id. at ¶7. The plaintiff believes Bade "made a comment something along the lines of, 'Well, you still want to stay at [Waupun]'"? Id.

The plaintiff testified that prior to the cell search, he recently had attempted to prevent security staff from transferring him to the Wisconsin Secure Program Facility, and the plaintiff thought the comment had to do with that. Id. at ¶8. The plaintiff wanted to prevent the transfer because he had filed a proposed class action lawsuit, and he wanted to remain a member of the class. Id. The plaintiff did not take Bade's comment after the cell search as a threat and does not know if Bade knew about the litigation. Id. at ¶9. The plaintiff said Bade "just kind of said it joking." Id.

About a half an hour after the cell search, Bade returned and handed the plaintiff some documents that had been confiscated during the search. Id. at ¶10. The plaintiff asked Bade to document on a property receipt the items that were taken and that were being returned, which he did. Id. at ¶11. The plaintiff believes the cell search on June 22, 2015 was "ordered and conducted as a result of the [2015 case] litigation" but admits that with respect to what Bade "was personally aware of, I don't know." Id. at ¶12.

12

The cell search annoyed the plaintiff's cellmate. Dkt. No. 90 at ¶45. The search occurred on a Monday and it took most of the remaining day for the plaintiff and his cellmate to straighten up their cell. Id. at ¶52. Once only the plaintiff's paperwork was returned after the cell search, it was obvious that he was "responsible" for the search; the plaintiff and his cellmate did not talk at all in the following days. Id. at ¶53.

On the property receipt the plaintiff received for his returned documents, the officer wrote, "Legal paperwork, examined by supervisors, returned to inmate." Id. at ¶47. Seven of the ten documents seized from the plaintiff's cell related to the 2015 case. Id. at ¶¶48-50.

The defendant stated that she does not recall if she ordered the June 22, 2015, search of the plaintiff's cell. Dkt. No. 90 at ¶77.

4. *June 26, 2015 Cell Searches*

On June 25, 2015, the defendant emailed Captain Thomas Core with what appears to be a request to search the plaintiff's cell. Dkt. No. 78 at ¶13. The email states only,

> Joshua Howard 271543 Sch F-41
> Legal loan supplies with case 15Cv557 on them, only items stamped "LEGAL LOAN" please.

Id. The defendant does not specifically recall asking staff to conduct this search. Id.

All items an incarcerated individual received with legal loan funds were stamped with a red Legal Loan stamp and the individual's DOC number. Id. at ¶14. Security was trained to know what the stamp looked like. Id. Although the

13

defendant's email stated to look for items stamped "LEGAL LOAN," what she meant was items stamped by the Legal Loan stamp, which actually just stated "Legal." Id. at ¶15. She would not have purposefully misidentified the stamp to cause security staff to have to page through every document fruitlessly. Id. She was just trying to identify what materials were issued pursuant to the plaintiff's legal loans. Id.

On June 26, 2015, an unidentified officer searched the plaintiff's cell. Id. at ¶27. According to the plaintiff, the officer was not able to complete the search before having to leave. Id. The plaintiff recalls, "It seemed like – I recall that he seemed like he had to be somewhere. So he left because of the time[.]" Id. The plaintiff alleges that the search left "1000's of pages of documents that had been strewn all over the floor." Id.

The search lasted one to two hours. Dkt. No. 90 at ¶55. When the plaintiff passed the officer who had conducted the search, he asked why the cell was being searched again the same week and the officer replied that the plaintiff "probably shouldn't sue the Governor." Id. The class action was the only case that the plaintiff had filed where the governor was a defendant, so he assumed the cell search was a continuation of security's response to that lawsuit and the comment let his cellmate know that he was also the cause for the second search. Id. at ¶56. The plaintiff and his cellmate repeated the post-search conduct of the cellmate waiting outside while the plaintiff retrieved his legal work off the floor but now that it was apparent that that the plaintiff was to blame for the repeated cell searches the cellmate did not hold his tongue and

the two got into an argument over the inconvenience inflicted on his cellmate. Id. at ¶57.

The plaintiff testified in his deposition that about an hour or an hour-and-half after the first officer left, he had begun to re-organize and straighten everything up when Officer Wiersma arrived to continue the cell search. Dkt. No. 78 at ¶28. The plaintiff described that Wiersma left his cell with a handful of paperwork. Id. at ¶29. The plaintiff caught Wiersma as he was leaving and asked for a receipt of what he was taking and Wiersma signed a property receipt. Id. At the deposition, when asked what the plaintiff and Wiersma spoke about after the search, the plaintiff said he suspected that he probably complained to Wiersma "about why this had to happen, why it was necessary, what couldn't have been done in the first two-hour search that, you know this was necessary." Id. at ¶30 The plaintiff is sure he was "frustrated at that point . . . because if the other officer had somewhere to be, he could have called in this officer and kind of updated him on where he was in the search, what he had looked at, what he hadn't and let him continue, but it seemed like there was no communication between them." Id. at ¶31. The plaintiff does not recall Wiersma "saying anything significant" to him after the June 26, 2015 cell search. Id. at ¶32.

When the plaintiff returned to his cell, his cellmate already had entered it and was standing on his paperwork which covered the floor. Dkt. No. 90 at ¶61. The cellmate repeated his comment that he was sick of this shit which led to a physical altercation between the plaintiff and his cellmate. Id.

15

About an hour later, the plaintiff's cell door opened and when he reported to the sergeant's desk, the officer who had searched his cell returned the legal work to him. Id. at ¶62. Included with the legal documents related to the 2015 case that were taken during the search were the letters and disbursements that the plaintiff had submitted for legal loans on June 18, 2015. Id.

On June 29, 2015, the defendant sent the plaintiff a memo informing him that his request for a legal loan in the 2015 case had been denied along with the DOC-1290, which she had signed on June 22, 2015. Id. at ¶63.

At times, the defendant would ask the security supervisor to conduct a cell search if the Business Office was given information from staff or was under the suspicion that individuals were violating the terms of the legal loan agreement. Dkt. No. 78 at ¶25. This would include an individual misusing their legal loan supplies by using them for a case which was not approved. Id.

When asked if the June 22 and 26, 2015 cell searches were out of the ordinary, the plaintiff opined that it was unusual only because, "It was repeated – this was on a Friday and it was repeated from the same cell search that Monday. So it was similar in length. It was similar in the destruction of the property in the cell." Dkt. No. 78 at ¶35.

The defendant would not have asked for multiple searches of the plaintiff's cell. Id. at ¶39. She believes that security staff searched his cell prior to June 25, 2015 for reasons in which she or the Business Office was not involved, then notified her of a potential problem with the legal supplies that

they found. Id. The defendant would never have asked for security to search an incarcerated individual's cell in an effort to retaliate against the individual because he filed a lawsuit. Id. at ¶40.

In her capacity as the person whose duty it was to administer the Legal Loan Program, the defendant would have known that the only legal loan supplies the plaintiff ordered in 2015 were fifteen envelopes. Dkt. No. 90 at ¶71. Also, at the time of the cell search it had been years since the plaintiff had ordered lined or typing paper under a legal loan. Id. On the disbursement requesting legal loan supplies for the 2015 case, the defendant drew a line over where the plaintiff had requested, "7, #10 envelopes." Id. at ¶72. While she did not remember this particular instance, the defendant assumed she wrote this because the "plaintiff still had remaining envelopes from his last legal loan supply request," which confirms that she had reviewed the legal loan supplies the plaintiff had previously ordered and should be in his possession. Id.

B.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477

17

U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

C.    Discussion

The defendant contends that the plaintiff's retaliation claim fails as a matter of law because her actions were not sufficiently adverse to support a retaliation claim. Dkt. No. 77 at 7, 9-12. The defendant also argues that she was not motivated by retaliation, but that she acted in furtherance of her duties in administering the legal loan program based on DAI policy. Id. at 7, 12-13.

The plaintiff contends that the record supports a finding that the defendant engaged in a campaign of harassment upon learning that the plaintiff had filed a class action suit against Waupun Correctional Institution.

18

Dkt. No. 88 at 2. He "submits that [the defendant's] conduct which, within the period of a week resulted in three separate, multi-hour cell searches which left [the plaintiff's] cell looking like a bomb went off, and two separate seizures of his legal filings and correspondence along with a threat to suspend his ability to obtain legal loans on his (9) other active cases was clearly retaliatory, without legitimate justification, and as adverse as this type of claim could possibly be." Id. at 1-2.

The plaintiff maintains that the defendant improperly denied his legal loan application[4] and threatened to suspend all legal loans. Id. at 9-13. He states that the June 26, 2015 threat to suspend all legal loans was improper because there is no rule preventing disbursements from being submitted with the legal loan application. Id. The plaintiff also contends that the cell searches would not have occurred but for his request for a legal loan in the 2015 case. Id. at 13-20. He asserts that there is no evidence that Waupun security staff were concerned about the filing of the 2015 case and that the June 22, 2015 cell search was not random. Id. The plaintiff argues that there is evidence all three cell searches were related to the 2015 case: the documents seized were related to the class action, the comments made by the officers were related to the class action and the defendant's email cites the class action. Id.

The plaintiff also contends that there was no legitimate basis for the defendant's investigation or the cell searches. Id. at 20-25. According to the

_____

[4] As stated, the plaintiff no longer is proceeding on a claim based on allegations that the defendant denied his legal loan application in retaliation for filing the 2015 case. Dkt. No. 54.

19

plaintiff, the defendant was investigating violations of rules that do not exist because it is unclear how an incarcerated individual could violate the terms of the legal loan agreement. Id. The plaintiff maintains that the defendant's email requested documents that do not exist because supplies are never stamped "Legal Loan" and the defendant knew that officers would not find "legal loan supplies" with the 2015 case number on them because the defendant was aware that the plaintiff had only ordered fifteen envelopes in 2015. Id. The plaintiff contends that the harassment was likely to deter future activity. Id. at 26-29. He states that the defendant's entire "investigation" was based on non-rule violations, that the reason for requesting the search was "spurious" because the information was in her database. Id.

To establish a *prima facie* case of retaliation in violation of the First Amendment, a plaintiff must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." Whitfield v. Spiller, 76 F.4th 698, 707-08 (7th Cir. 2023) (quoting Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009)). If "a *prima facie* case is established, the burden shifts to the defendant to rebut the claim, that the activity would have occurred regardless of the protected activity." Manuel v. Nalley, 966 F.3d 678, 680 (7th Cir. 2020) (citing Kidwell v. Eisenhauer, 679 F.3d 957, 964 (7th Cir. 2012)). If the defendant rebuts the claim, the plaintiff

"must demonstrate that the proffered reason is pretextual or dishonest." Id. (citing Kidwell, 679 F.3d at 969).

As to the first element, the plaintiff has a right under the First Amendment to file a federal lawsuit regarding prison conditions. See Douglas v. Reeves, 964 F.3d 643, 646 (7th Cir. 2020) (quoting Gomez v. Randle, 680 F.3d 859, 866 (7th Cir. 2012) ("A prisoner has a First Amendment right to make grievances about conditions of confinement.")); see also Babcock v. White, 102 F.3d 267, 276 (7th Cir. 1996) ("The federal courts have long recognized a prisoner's right to seek administrative or judicial remedy of conditions of confinement, as well as the right to be free from retaliation for exercising this right.") (citation omitted)). The plaintiff has satisfied the first element of a retaliation claim.

To prove the second element, the plaintiff ultimately must show that he suffered a deprivation that would likely deter First Amendment activity in the future. Bridges, 557 F.3d at 546. In determining whether an action would likely deter First Amendment activity, the court applies an objective test and considers "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." Douglas, 964 F.3d at 646 (citing Surita v. Hyde, 665 F.3d 860, 878 (7th Cir. 2011)). "Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact, but when the asserted injury is truly minimal, [the court] can resolve the issue as a matter of law." Id. at 647.

Whether the plaintiff suffered a deprivation that would likely deter First Amendment activity in the future depends on what the defendant did. It is undisputed that on June 22, 2015, the defendant denied the plaintiff's legal loan disbursement requests for the 2015 case, and on one of the disbursement denials, the defendant wrote, "Further use of legal supplies for cases not approved will result in suspension of all loans." It is also undisputed that on June 25, 2015, the defendant sent an email requesting a cell search looking for materials related to the 2015 case stamped "LEGAL LOAN." Two cell searches were conducted on June 26, 2015, apparently because the officer who conducted the first search that day was unable to complete the search. Legal work related to the 2015 case was taken from the plaintiff's cell and returned to him about an hour after the search. The search was very disruptive to the plaintiff and his cellmate and it left thousands of pages of the plaintiff's legal documents strewn all over the floor of his cell.

The defendant contends that the cell search did not amount to a sufficiently adverse action because she asked for only one cell search, she asked only for items referencing the 2015 case stamped with the Legal Loan stamp and she was not involved in the cell search itself. The defendant also points out that the plaintiff's legal materials were returned to him after the search and were not confiscated. Finally, the defendant contends that the note she wrote on the plaintiff's disbursement denial was meant to notify him that she would enforce a policy against him if he continued to try to get legal loan money for a case that had not been approved for a legal loan.

A targeted cell search and confiscation of properly can amount to an objectively serious deprivation. See Manuel v. Nalley, 966 F.3d 678, 680 (7th Cir. 2020) ("The parties agree that [the plaintiff] was engaged in activity protected by the First Amendment when he filed grievances and a deprivation in the form of a [cell] shakedown occurred that would likely deter future activity."). In this case, however, the defendant requested one cell search and she did not conduct any cell searches. The plaintiff's materials taken during the search were returned to him about an hour after the search. The defendant simply advised the plaintiff that continuing to request a legal loan disbursement for a case that had not been approved for legal loan would result in consequences. The defendant was not involved in the way the officers conducted the searches—the amount of time they took, leaving the plaintiff's cell in disarray or stopping the search to continue it later.

It is difficult to separate the defendant's action—requesting one search (which she did)—from the search itself (which she did not conduct). The defendant's June 25, 2015 email requesting a cell search led to the cell search on June 26, 2015, which wasn't completed and resulted in a second cell search that day. The three cell searches the plaintiff claims were retaliatory, arguably resulted in a deprivation likely to deter First Amendment activity in the future. See Manuel v. Nalley, 966 F.3d at 680. The defendant does not remember if she requested the June 22, 2015 cell search and the record does not support a finding that the defendant had any involvement in that search. The defendant's June 25, 2015 email, which included a request for legal materials that were

23

seized from the plaintiff but were returned after one hour, and a notification that the defendant would enforce a policy against the plaintiff if he made further requests for legal loan disbursements for the 2015 case, probably do not amount to a serious deprivation.

Even if the defendant's actions amounted to an objectively serious deprivation such that the plaintiff satisfied the second element of a retaliation claim, he has not satisfied the third element. The record is devoid of evidence that the plaintiff's filing of the 2015 case was a "motivating factor" in the defendant's actions. "A motivating factor is a factor that weighs in the defendant's decision to take the action complained of—in other words, it is a consideration present to his mind that favors, that pushes him toward, the action." Hasan v. U.S. Dep't of Lab., 400 F.3d 1001, 1006 (7th Cir. 2005). The motivating factor amounts to a causal link between the activity and the unlawful retaliation. Manuel, 966 F.3d at 680 (citing Kidwell, 679 F.3d at 965).

The plaintiff contends that the defendant's actions were improper and that she did not have a legitimate reason for them. According to the plaintiff, he did not violate any rule by submitting his disbursement requests along with his legal loan application, the defendant's investigation into his potential rule violations was improper and her email asked officers to look for legal supplies related to the 2015 case stamped with "Legal Loan" knowing that supplies are stamped with "Legal" (not "Legal Loan").

Contrary to the plaintiff's assertion that the defendant acted because he filed the 2015 case, the evidence shows that the defendant's actions stemmed

24

from the plaintiff's legal loan application and disbursement requests for the 2015 case and were in furtherance of enforcing the DAI's legal loan policy. The plaintiff concedes that the cell searches would not have occurred but for the his for a legal loan in the 2015 case. Dkt. No. 88 at 13-20. The defendant did not act because the plaintiff filed the 2015 case; she acted because the plaintiff requested legal loan disbursements for a case that had not been approved for a legal loan. The plaintiff has not shown that his protected conduct of filing the lawsuit prompted the defendant's actions. See Whitfield, 76 F.4th at 711-12 (to establish a *prima facie* case, the court asks whether the defendant imposed the adverse action in response to the protected activity).

The plaintiff does not agree that the DAI legal loan policy prohibited him from obtaining a legal loan for the 2015 case—a class action in which he was the lead plaintiff. The defendant denied the plaintiff's legal loan application for the 2015 case because the case had multiple plaintiffs which violated the DAI Policy 309.51.01 provision that states, "The supplies provided to an inmate pursuant to a legal loan may not be used by the inmate to do other inmates' legal work. Any such use constitutes a disciplinary offense." Policy 309.51.01 also states that an incarcerated person must apply for a loan and submit a DOC-1290 for each case for which he seeks legal loans. The plaintiff submitted disbursement requests for the 2015 case before that case had been approved for a legal loan. Requesting disbursement of legal loan money for a case that has not been approved for legal loan is considered misuse of legal loan money. Dkt. No. 78 at ¶24. The plaintiff states that it was his usual practice to submit

25

his legal loan application at the same time he submitted his disbursement requests for the legal loan. Dkt. No. 90 at ¶21. Whether that is the case or not, the defendant's warning that if the plaintiff made future disbursement requests for the 2015 case, which had been denied for a legal loan, is consistent with policy.

The plaintiff contends that the fact that the defendant wrote "Legal Loan" in her email but that legal loan supplies are stamped only "Legal" shows that she was harassing him by asking for the cell search because no documents would read "Legal Loan" which meant that the officer conducting the cell search would have to look through everything in the cell. The plaintiff's argument doesn't make sense. The officer conducting the cell search would have had to look through everything in the cell to find all legal materials related to the 2015 case regardless of whether they said "Legal" or "Legal Loan." In any case, officers were trained that legal loan supplies were stamped with "Legal" and the "inmate number." The defendant's misstatement in the email does not support an inference that she harassed him, or retaliated against him, for filing the 2015 case.

The plaintiff has not established a *prima facie* case that the defendant retaliated against him for filing the 2015 case because a reasonable fact finder could not conclude that the plaintiff's filing of that case was a motivating factor in the defendant's actions. The court will grant the defendant's motion for summary judgment and dismiss this case.

Because the court is granting the defendant's motion for summary judgment on the merits, it will not address the defendant's claim that she is entitled to qualified immunity.

## III.    Conclusion

The court **GRANTS** the defendant's amended motion for summary judgment. Dkt. No. 76.

The court **GRANTS** the plaintiff's motion for leave to file excess pages. Dkt. No. 94.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the

full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 10th day of September, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

28